**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| SILICON DALES LTD, ROBIN SCOTT, THOMAS MORTON, MARCEL SCHMITZ, and NUNO FILIPE MAGALHÃES AREIAS,<br><br>    Plaintiffs,<br><br>v.<br><br>STRIDE, INC.,<br><br>    Defendant. | Civil Action No.: |

## COMPLAINT

Plaintiffs Silicon Dales Ltd ("Silicon Dales"), Mr. Robin Scott, Mr. Thomas Morton, Mr. Marcel Schmitz, and Mr. Nuno Filipe Magalhães Areias (collectively "Plaintiffs" and each a "Plaintiff"), by and through their attorneys, for their Complaint against Defendant Stride, Inc. ("Stride") allege, on knowledge and otherwise upon information and belief, as follows:

### I.    PRELIMINARY STATEMENT

1.    This breach of contract action arises from Defendant Stride's wrongful repudiation and material breach of contractual obligations owed to Plaintiffs.

2.    This Complaint also alleges federal and Virginia securities fraud, in addition to a violation of Proxy Rule 14a-9 promulgated under the Securities Exchange Act of 1934. Mr. Scott, Mr. Morton, Mr. Schmitz, and Mr. Areias (collectively "the RSA Plaintiffs") are former independent contractors of Stride, a publicly traded online education company headquartered in Virginia. Through a systematic scheme of deception, Stride materially misrepresented its enrollment figures, student retention rates, and regulatory compliance to the investing public and

1

RSA Plaintiffs, artificially inflating the value of its securities and defrauding RSA Plaintiffs who accepted Stride's restricted stock awards ("RSAs") as compensation for their services.

## II.    SUBJECT MATTER JURISDICTION

3.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and in which citizens or subjects of a foreign state are additional parties. Stride is a citizen of both Virginia (principal place of business) and Delaware (place of incorporation), while Mr. Morton is a Florida citizen, both Mr. Schmitz and Mr. Magalhães are citizens of Portugal, Mr. Scott is a British citizen, and Silicon Dales Ltd is a citizen of the United Kingdom (specifically, England and Wales).

4.      This Court has federal question jurisdiction over Counts VI (Federal Securities Fraud) and VIII (Violation of Rule 14a-9) pursuant to 28 U.S.C. § 1331 because these counts reflect civil actions arising under the Constitution, laws, or treaties of the United States. Count VI is a claim under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Count VIII is a claim under Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

5.      Assuming *arguendo* that diversity jurisdiction is lacking, this Court has supplemental jurisdiction over Counts I (Breach of Contract for Silicon Dales), II (Breach of Contract for RSA Plaintiffs), III (Breach of Contract for RSA Plaintiffs – Failure to Issue Restricted Stock Awards), IV (Breach of Implied Covenant of Good Faith and Fair Dealing), V (Tortious Interference with Business Relationship), VII (Virginia Securities Fraud), and IX (Fraudulent Inducement) in this matter pursuant to 28 U.S.C. § 1367. These claims are so related

to the other counts in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## III.    PERSONAL JURISDICTION AND VENUE

6.    Pursuant to 28 U.S.C. § 1391(c)(2), Stride resides in any judicial district in which it is subject to the court's personal jurisdiction with respect to the civil action in question.

7.    Stride's substantial, continuous, and systematic business contacts with Virginia—including operating its corporate headquarters in this District, employing personnel in Virginia, entering into contracts governed by Virginia law, and conducting significant business operations throughout the Commonwealth—establish general personal jurisdiction over Stride in this District.

8.    Stride is also subject to specific personal jurisdiction in this District for purposes of the contractual and securities fraud claims alleged herein. Stride explicitly submitted to the jurisdiction of this Court per the terms of the Master Services Agreement, Independent Consulting Agreements and related Statements of Work that provide for RSA compensation to RSA Plaintiffs and that form the basis for Plaintiffs' contractual claims.

9.    Therefore, venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because Stride resides in the Alexandria Division of the Eastern District of Virginia and a substantial part of the events giving rise to the claims in this action occurred in this District.

## IV.    PARTIES

10.    Stride is a publicly traded corporation incorporated in Delaware with a principal place of business located at 11720 Plaza America Drive, 9th Floor, Reston, Virginia 20190 that trades on the New York Stock Exchange under the symbol "LRN."

11.    Silicon Dales is a corporate entity with its principal place of business and place of incorporation in the United Kingdom (specifically, England and Wales).

12.     Mr. Robin Scott ("Mr. Scott") is an individual and a British citizen who founded Silicon Dales Ltd and served as its Director until September 25, 2024.

13.     Currently, Mr. Scott is a consultant and shareholder of Silicon Dales.

14.     Mr. Thomas Morton ("Mr. Morton") is an individual and citizen of the state of Florida.

15.     Mr. Marcel Schmitz ("Mr. Schmitz") is an individual and citizen of the country of Portugal.

16.     Mr. Nuno Filipe Magalhães Areias ("Mr. Magalhães") is an individual and citizen of the country of Portugal.

17.     Mr. Scott, Mr. Morton, Mr. Schmitz, and Mr. Magalhães also independently contract as software engineers.

18.     Because Mr. Scott, Mr. Morton, Mr. Schmitz, and Mr. Magalhães each individually contracted to exchange their services for a restricted stock award ("RSA") from Stride, they are collectively referred to as "RSA Plaintiffs."

## V.     FACTUAL BACKGROUND

### A.     The Plaintiffs and Their Engagement with Stride

19.     Silicon Dales is a technology consulting firm incorporated in the United Kingdom that specializes in software development and consulting services for education technology companies. Beginning in February of 2024, Silicon Dales entered into a Master Services Agreement ("MSA") with Stride, followed by multiple Statements of Work, pursuant to which Silicon Dales provided specialized consulting and software development services to Stride, including touchless enrollment systems and other critical technology solutions. The MSA and associated Statements of Work—including Statement of Work No. 2 ("SOW 2"), a 36-month

engagement providing for substantial annual compensation, and Statement of Work No. 3 ("SOW 3")—governed the parties' contractual relationship.

22. The RSA Plaintiffs are software engineers and consultants who separately contracted with Stride through Individual Consulting Agreements ("ICAs") and corresponding Individual Statements of Work ("ICA SOW 1"). Unlike Silicon Dales' cash-based compensation, the Individual Plaintiffs agreed to exchange their professional services for valuable consideration in the form of Stride restricted stock awards ("RSAs"). Each ICA SOW 1 established a 36-month service term, during which the RSA Plaintiffs' RSAs would gradually vest, converting their labor into equity in Stride.

23. For over a year, Plaintiffs faithfully performed their contractual obligations, providing Stride with high-quality technology services and deliverables. The engagement, however, was not without difficulty.

24. During the course of his engagement with Stride, Mr. Scott observed and documented internal dysfunction and improper practices at Stride.

25. Mr. Scott raised concerns regarding Stride's dysfunctional operations and practices with various Stride officers and employees throughout the engagement.

26. The MSA and SOWs named Ms. Janice Gruneberg, Stride's Executive Vice President of K12 Operations, as Executive Sponsor for Silicon Dales' engagement. During the engagement, Ms. Gruneberg prompted Mr. Scott via Slack to provide candid feedback regarding Stride's operations and those of its subsidiaries.

27. In response, Mr. Scott exposed significant operational inefficiencies including: (a) wasteful spending on external vendors for services that Stride could host internally; and (b)

conflicts of interest regarding legacy payment systems owned by a subsidiary's previous parent company.

28.    Upon information and belief, Stride CEO, Mr. James Rhyu, was present during or became aware of that exchange.

29.    Shortly after Mr. Scott disclosed these inefficiencies, the CEO of the Stride subsidiary at issue was terminated.

30.    Upon information and belief, Mr. Todd Goldthwaite is a Managing Director at Stride and leads Stride's student enrollment and customer service operations.

31.    Thereafter, Mr. Goldthwaite explicitly referenced that incident in a subsequent call with one or more Plaintiffs, berating Plaintiffs and accusing Silicon Dales of "getting people fired."

32.    Upon information and belief, Mr. Goldthwaite thereafter harbored personal animus against Plaintiffs for exposing organizational dysfunction at Stride and its subsidiaries.

33.    During the course of their engagement, Plaintiffs also observed a broader pattern of operational dysfunction at Stride. Senior personnel within Stride frequently expressed an air of resignation regarding the state of Stride's information-technology systems, including statements to the effect that "nothing works around here" and "things take forever to get done." Upon information and belief, this dysfunction was widely known within Stride at the executive level and reflected systemic deficiencies in Stride's internal controls and oversight of its operations.

34.    Toward the end of the SOW 3 engagement, Plaintiffs identified that Stride was retaining and transmitting student-level data—including data in repositories that, by Stride's own access controls and data-classification policies, should not have contained such data—in an insecure manner. Consistent with their professional obligations and their own data-hygiene

practices, Plaintiffs did not access the contents of those repositories. Plaintiffs nonetheless made responsible disclosures to Stride identifying the existence and insecure handling of such data.

35. In or around July and August 2025, Plaintiffs observed that multiple Stride products were inadequate and failing, that multiple improvement projects were behind schedule, and that roadmaps for ongoing projects were being inexplicably stalled by Stride's management.

36. In response to the stalled roadmaps, Silicon Dales pitched Mr. Rhyu directly an alternative product solution that would address many problems with Stride's products. During a 30-minute call, Mr. Rhyu expressed interest in "investing" in the proposal and agreed that Stride's current plans were inadequate.

37. Upon information and belief, despite Mr. Rhyu's interest in the proposal, Ms. Gruneberg and Mr. Goldthwaite rejected it vehemently via an email thread including Mr. Rhyu, Stride CFO Ms. Donna Blackman, Ms. Gruneberg, Mr. Goldthwaite, and Mr. Scott—with no further explanation or exploration.

38. Upon information and belief, immediately following that pitch, Mr. Goldthwaite contacted the leadership of one of Stride's subsidiaries, Tallo, effectively destroying Silicon Dales' reputation with the Tallo leadership.

39. Shortly thereafter, authority over Plaintiffs' engagements with Stride was purportedly transferred from Ms. Gruneberg to Mr. Goldthwaite during a brief telephone call, without formal notice and without updating or modifying the MSA.

40. Plaintiffs' relationship with Stride deteriorated under Mr. Goldthwaite's authority.

41. Upon information and belief, Mr. Goldthwaite, shortly thereafter, and motivated by animus against Plaintiffs, began to implement a scheme to manufacture cause to terminate Stride's agreements with Plaintiffs.

42. Between August and November 2025, Stride issued conflicting instructions to Plaintiffs that were, upon information and belief, designed to induce error, manufacture grounds for termination, and undermine Plaintiffs' reputations with MedCerts LLC and the Stride subsidiary, Tallo.

43. Specifically, Stride instructed Plaintiffs to focus on their projects for Tallo and to begin disengaging from their projects for MedCerts. During this same period, on a documented call with Mr. Scott and Mr. Morton, Stride representatives Mr. Goldthwaite and Mr. Pat Neeman (Stride's Senior Vice President of Finance, reporting directly to Stride CFO Ms. Donna Blackman) confirmed that Silicon Dales would continue working on Tallo "until the end of the year." When Mr. Scott expressly clarified on that call that he understood "the end of the year" to mean the end of the financial year (*i.e.*, through June 2026), neither Mr. Goldthwaite nor Mr. Neeman contradicted that understanding.

44. When Plaintiffs attempted to comply with that instruction via an email to MedCerts outlining reduced work for MedCerts, the MedCerts team reacted with significant concern and were surprised that Plaintiffs were disengaging from work on the projects.

45. To protect the MedCerts team Plaintiffs pivoted in good faith and increased resources to complete both projects.

46. Immediately following the call referenced in Paragraph 43 above, Mr. Neeman scheduled a recurring weekly meeting with Mr. Scott and Mr. Morton extending through the end of June 2026.

47. Upon information and belief, Stride was at the same time internally planning to terminate Plaintiffs in late November 2025—demonstrating that Stride's representations regarding continued engagement were knowingly false, and that Stride was acting in bad faith to induce

Plaintiffs to deliver additional work product within what Stride intended to function as a covert termination window rather than a contractual notice period.

48.     Upon information and belief, Stride and Mr. Goldthwaite allowed Plaintiffs to complete this additional foundational work knowing that Stride and Mr. Goldthwaite intended to terminate Plaintiffs and their RSAs the moment the work was delivered.

49.     Stride's internal operational dysfunction extended beyond its treatment of Silicon Dales. On October 28, 2025, Stride announced on its Q1 FY2026 earnings call that technical failures on an unrelated project had caused significant product experience issues and contributed to enrollment shortfalls.

50.     These technical failures were similar in nature to the issues Silicon Dales had reported for systems related to its SOW 3 work, which Stride had ignored.

51.     On October 2, 2025, Silicon Dales issued Invoice No. 242833 for services rendered under SOW 3.

52.     Pursuant to Section 2 of the MSA, Stride was obligated to pay undisputed invoices within 45 days of receipt.

53.     The payment deadline for Invoice No. 242833 was November 16, 2025.

54.     Stride failed to honor its contractual obligations. Stride failed to make payment to Silicon Dales on or before November 16, 2025, thereby entering into material breach of the MSA on November 17, 2025.

55.     On or about October 19, 2025, Silicon Dales also issued Invoice No. 242836 for SOW 2 services.

56.     Pursuant to Section 2 of the MSA and the SOW 2 milestone schedule, payment of Invoice No. 242836 was due no later than December 3, 2025.

57.    Stride failed to pay Invoice No. 242836 on or before December 3, 2025, thereby entering into a second, independent material breach of the MSA on December 4, 2025—at which time Stride had been in continuous, uncured material breach of the MSA since November 17, 2025.

58.    Throughout the parties' multi-year course of dealing under the MSA, prompt net-45 performance had been treated as an essential and fundamental term of the parties' bargain. Silicon Dales had at the inception of the MSA required Stride to pay a deposit before commencing work, and Stride had thereafter remitted invoiced amounts within the contractual net-45 window throughout 2024 and the first three quarters of 2025.

59.    Despite its material breach and ongoing failure to cure, on November 19, 2025— while still in default—Stride purported to terminate the MSA and SOW 2 "for convenience" under Section 11(b) of the MSA, effective December 19, 2025, and simultaneously purported to terminate the RSA Plaintiffs' ICAs and ICA SOW 1s.

60.    Under well-established Virginia law, a party that is itself in material breach of a contract cannot enforce termination-for-convenience provisions against the non-breaching party. Stride's termination notices were therefore invalid and void *ab initio*, and the contracts remain in full force and effect.

61.    Stride did not remit payment for either Invoice No. 242833 or Invoice No. 242836 until December 8, 2025—nineteen (19) days after Stride had issued its purported termination notice.

62.    Stride's belated December 8, 2025 payments did not cure its prior material breaches and could not retroactively validate Silicon Dales's termination notice. The termination notice was void *ab initio* when issued on November 19, 2025. By the date of Stride's payments, Silicon Dales

had already declared Stride in material breach and reserved its rights to treat the contracts as remaining in full force and effect.

63.    Stride's purported termination of Silicon Dales was not merely procedurally defective—it was undertaken in bad faith, along with termination of the RSA Plaintiffs. The terminations were timed to prevent the RSA Plaintiffs' RSAs from vesting, thereby allowing Stride to extract substantial value from their labor while avoiding its obligation to compensate them with equity. Stride terminated the RSA Plaintiffs' agreements knowing that their RSAs would continue to vest, and for the purpose of preventing that vesting from continuing.

64.    Even if the terminations were not barred by Stride's prior material breach, Stride failed to comply with the contractual notice requirements. Section 11(b) of the MSA requires 30 days' prior written notice for a termination for convenience. Stride's November 19, 2025 termination notice, purporting to be effective December 19, 2025, was issued while Stride remained in uncured material breach and thus could not satisfy the contractual prerequisites for a valid termination.

65.    Silicon Dales promptly disputed Stride's purported termination. On December 9, 2025, Silicon Dales issued a formal Notice of Dispute to Stride, rejecting the validity of the termination, suspending all "wind-down" activities, and reserving all rights and claims arising from Stride's wrongful conduct. Silicon Dales notified Stride that, under the first material breach doctrine recognized by Virginia courts, Stride's termination notice was void and its contract remained in full force and effect.

66.    Stride's subsequent conduct further confirmed that it had no good-faith basis for its purported termination. By letter dated December 9, 2025, Stride purported to issue what it described as a "final payment" in respect of SOW 2 services rendered during December 2025, but

unilaterally reduced the charges set forth on Silicon Dales' Invoice No. 242843 and paid only a portion of the amount due.

67. By email dated December 17, 2025, Mr. Goldthwaite confirmed that Stride's "final payment" to Silicon Dates had been prorated to compensate Silicon Dales only for services rendered through December 9, 2025, on the stated basis that Silicon Dales had "discontinu[ed] services on December 9, 2025 and not return[ed] to perform wind-down activities."

68. Stride's tender of compensation for services performed in December 2025—after Stride's purported November 19, 2025 "termination"—constitutes an admission that Silicon Dales remained engaged under SOW 2 well past the date Stride now claims SOW 2 ended and is irreconcilable with Stride's position that SOW 2 was effectively terminated as of November 19, 2025.

69. Silicon Dales rejected Stride's prorated payment and, by credit note issued and viewed on December 9, 2025, formally cancelled Invoice No. 242843, on the basis that the invoice had been issued in expectation of a continuing contractual relationship that Stride had wrongfully repudiated.

70. Stride's termination of Silicon Dales was premeditated and coordinated among Stride leadership well in advance of the November 19, 2025 termination notice.

71. For example, an email from Ms. Christine Spalding, Tallo's Head of Operations, stated that Mr. Goldthwaite had indicated that Plaintiffs' work for Tallo needed to be "wrapped by End of November," despite the fact that no previous project schedule or roadmap included that deadline. Plaintiffs had repeatedly sought clarification of this purported deadline directly from Tallo at Mr. Goldthwaite's instruction, and Ms. Spalding's email confirmed that the directive originated with Mr. Goldthwaite himself.

12

72.     At the same time, Mr. Goldthwaite was inducing Silicon Dales to prepare proposals for additional work that would run through June of 2026.

73.     Upon information and belief, Mr. Goldthwaite deliberately held out the prospect of continued and future work to Plaintiffs in order to induce them to complete their deliverables for Tallo, with the premeditated intent to terminate their agreements upon delivery of the work product, thereby enabling Stride to obtain the full benefit of Plaintiffs' services while depriving them of their contractually promised compensation.

74.     Upon information and belief, Stride sought to manufacture cause to terminate Plaintiffs for breach.

75.     Upon information and belief, Stride's efforts to manufacture cause for termination included: (a) deliberately delaying approval of project roadmaps to create operational friction and impede Plaintiffs' progress; (b) issuing contradictory directives—instructing Plaintiffs to "off-ramp" certain work while simultaneously demanding that they not deviate from the original plan—designed to induce error and create a pretextual basis for criticism; and (c) adopting an unnecessarily hostile and adversarial tone in communications, including an angry reply-all email, calculated to provoke a reaction that could be characterized as unprofessional.

76.     Plaintiffs continued to deliver high-quality work despite Stride's efforts to sabotage them. Upon information and belief, when Stride was unable to establish cause, it was forced to resort to a termination for convenience.

77.     Stride's attempt to terminate the contract for convenience was ineffective because Stride was in material breach of the contract for failure to make timely payments when it provided its notices of termination.

78. Stride's wrongful termination was calculated to occur immediately prior to the vesting of a 20% tranche of RSA Plaintiffs' RSAs in February 2026.

79. By this action, Plaintiffs seek damages for Stride's material breach of contract, including but not limited to: (a) for Silicon Dales, the remaining value of the 36-month SOW 2 engagement through August 2027, plus reliance damages, restitution, and other damages; and (b) for the RSA Plaintiffs, the full value of their RSAs, the value of the services it provided to Stride without benefit of the promised compensation, and consequential damages. Plaintiffs also seek a declaration that Stride's purported terminations were invalid, that the agreements remain in full force and effect, and that Stride's conduct constituted a breach of the implied covenant of good faith and fair dealing.

80. Stride's conduct reflects a deliberate strategy to exploit Plaintiffs—inducing them to perform valuable services with promises of long-term engagement and equity compensation, then terminating their agreements to avoid its payment obligations. Plaintiffs bring this action to hold Stride accountable for its contractual breaches and to recover the damages they have suffered as a result of Stride's wrongful conduct.

**B.    RSA Plaintiffs Are "Purchasers" of Securities and Thus Have Standing.**

81. RSA Plaintiffs contracted with Stride to exchange their services for equity compensation—namely, Stride's restricted stock awards ("RSAs").

**C.    Stride Painted a Rosy Picture of Its Performance in Public Statements.**

82. On Stride's August 6, 2024, earnings call for Quarter 4 of Stride's Fiscal Year 2024 (April 2024 to June 2024), Mr. Rhyu, boasted about the company's enrollment performance: "We had our highest in-year enrollment ever, pushing us to the highest enrollment level in the

company's history, even larger than during the pandemic highs. And we finished the year with more enrollments than we started for the second straight year."

83.    On the same call, Ms. Blackman stated that Career Learning middle and high school enrollments increased by 72,700, or more than 10% than in the prior year.

84.    Ms. Blackman further elaborated that "Enrollments in Gen Ed for the year totaled 121,600, up more than 8%."

85.    On Stride's October 22, 2024, earnings call for Quarter 1 of Fiscal Year 2025, Mr. Rhyu continued to tout the strength of the company's enrollments:

> Now as you saw in our press release, we announced record enrollments for our first quarter, an 18.5% year-over-year growth and an acceleration in demand from this time last year. Apart from the pandemic year, this is the highest recorded year of gross enrollment growth this company has seen since it became publicly traded over 15 years ago. We have seen continual and rising demand for the services we provide and the support for students this enables.

86.    On the same call, Ms. Blackman stated that Stride's "total enrollments for the quarter exceeded 222,000, almost 100,000 more than [Stride] had prior to the pandemic in FY 2020. Families continue to seek out educational opportunities and Stride is filling a need in the market for virtual options."

87.    Ms. Blackman continued, stating that "Career Learning enrollments grew 30.4% to 91,700," while there was a "General Education . . . enrollment growth of 11.3% to 130,900 students."

88.    On October 25, 2024, Stride issued a false and misleading proxy statement ("2024 Proxy") that sought the votes of shareholders to re-elect Stride's Board of Directors.

89.    The directors oversaw and approved the drafting and submission of the 2024 Proxy before it was filed with the SEC and distributed to Stride's shareholders.

90.    The directors issued materially misleading statements in the 2024 Proxy.

91.    The 2024 Proxy stated:

Our Board believes full and open communication with management is essential for effective enterprise risk management and oversight. Members of our Board discuss strategy and risks facing the Company with our CEO and our senior management at meetings of the Board, or when members of our Board seek to raise and focus on a particular area of risk, such as meeting state academic accountability standards at the schools we manage, ensuring the privacy of student information, compliance with state regulatory and reporting requirements, or information technology cybersecurity protections and preparedness. Because our CEO and Chair of the Board set the agenda for Board meetings, each functional division of the Company can identify and bring to our Board's or Board committees' attention risk-related topics that may require added focus, which have included: evolving state curriculum standards, student engagement and retention, education technology, legal and policy matters, information security and succession planning. Our CEO also periodically presents to our Board on the strategic, financial and operational issues facing the Company, which frequently includes a review of associated risks and opportunities.

Management is responsible for identifying, prioritizing, remediating and monitoring the day-to-day management of risks that the Company faces and applying the Company's disclosure controls and procedures, while our Board, as a whole and through its committees, is responsible for the oversight of enterprise risk management. In fiscal 2024, the Audit Committee continued to work directly with a major independent accounting firm to support the Company's internal audit function in risk management.

This combination provides us with the focus, scope, expertise, alignment and continuous attention necessary for effective risk management and disclosures. While our Board is ultimately responsible for risk oversight, three of its committees concentrate on specific risk areas:

The Audit Committee oversees financial reporting and internal controls, school and corporate compliance, cybersecurity and operations risk and discusses with management the Company's policies with respect to those matters. Our internal audit department prepares risk management reports that are provided to the Audit Committee on a quarterly basis, or as needed. The Audit Committee receives regular reports from management, including the Chief Information Security Officer, on our cybersecurity risks. In addition, management updates the Committee on any cybersecurity incidents it considers to be significant or potentially significant. The Audit Committee reports to the full Board regarding its activities, including those related to cybersecurity. In addition, the Audit Committee assists the Board in the oversight of legal risk management. A Legal Compliance and Ethics Committee (consisting of senior management members)

16

maintains a Legal Compliance and Ethics Program, which includes a Chief Compliance Officer.

The Legal Compliance and Ethics Committee provides reports to the Audit Committee on the Company's legal risks and compliance-related matters in the schools we serve and at the corporate level. Our Compensation Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs and retains outside compensation and legal experts for that purpose.

Finally, our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risks associated with the organization, membership and structure, or design, of the Board, succession planning and corporate governance. The Board committees may retain independent counsel, experts or advisors as provided for in their charters, and the Board as a whole has access to such advisors and such other independent advisors that the Company retains or that the Board considers necessary to discharge its responsibilities, including in connection with risk oversight.

92.     On a January 28, 2025, earnings call for Quarter 2 of Fiscal Year 2025, Mr. Rhyu stated the following:

We have once again posted record enrollments, copying 230,000 students. We continue to execute against the backdrop of ongoing strong demand. Coming out of the pandemic, we were all uncertain if the increase in demand for our programs was structural or temporary.

And for three consecutive years now, we have seen increasing growth in our business. And also for three consecutive years, we see continued in-year strength in demand. The macro environment for our business is as strong as ever. And as long as we can continue to execute effectively, I believe we can benefit from these conditions. While every business has challenges, I believe most of ours are currently within our control.

93.     On the same call, Ms. Blackman stated the following: "Total average enrollments of 230,600, up 19.4%. . . . Revenue in our career learning, middle and high school programs grew 29% to $213.1 million. This strength was driven by enrollment growth of 30.9% year-over-year."

94.     Ms. Blackman also added that "Average enrollments were up 12.5% from last year to 135,800. During the quarter we saw accelerating enrollment growth in both of these lines of

17

revenue. As I mentioned earlier, this is now the third year in the row that we've seen strength in in-year enrollments."

95.     Ms. Blackman continued, "Given the continued growth in enrollments and margin improvements, we are raising our full year revenue and profit guidance and now expect revenue in the range of $2.320 billion to $2.355 billion, up from $2.225 billion to $2.3 billion last quarter. Adjusted operating income between $430 million and $450 million, up from $395 million to $425 million last quarter."

96.     Finally, Mr. Rhyu further explained the enrollment caps imposed by government:

Well, we're always dealing with programs that have enrollment caps actually, like that, it's not a new thing. The good news is that in most of the programs, the enrollment caps are generally not long-term fixed. So there's two flavors of enrollment caps, generally speaking. One is, I'll say, a government-imposed cap, i.e., state-imposed enrollment cap in a certain state for a certain program. And the other is, I'll say, sort of a partner-imposed cap or one of our partners for whatever good reason they have imposed the cap. And in both of those cases, over time, generally speaking, there is a conversation to be had to raise caps when necessary. We historically have been reasonably successful in raising caps when the demand warrants it, meaning if there is an excessive amount of demand for a program. We go with the data to whoever whichever counterparty is and we show them the data that suggests that there's strong demand, it's being unmet and where there's need, and we usually go with the sort of the stories, if you will, of need, meaning these are usually families that don't have other alternatives for one reason or another. They are very valid alternatives or they are very valid reasons to not have other alternatives. And we want to just -- we want to be able to serve students. And where students in states aren't being served through another mechanism and we may be the only mechanism through which they can be served, we think it's justified to raise caps. And we've been fairly successful in our history and we think we can continue to be successful in having those conversations with our partners or with state government agencies to do that for the benefit of students.

97.     On April 29, 2025, Stride continued to broadcast its success in enrollment growth. For example, Ms. Blackman stated that "we continue to see strong [year-to-year] demand in Q3. We finished the quarter with enrollment up over 21% from last year, and we believe this has set

18

us up to once again finish the Fiscal Year with more enrollments than we started for the third year in a row."

98.    Ms. Blackman continued:

Revenue from our career learning middle and high school programs grew to $223.9 million, up 33%. This strength was driven by enrollment growth of 34% to [98,700] enrollments, General Education revenue was $370.8 million, up 13% from last year, which was also driven by continued enrollment growth in the quarter. Average enrollments were up 14% from last year to [141,500]. Total revenue per enrollment across both lines of revenue was $2,415 compared to $2,420 last year.

99.    On August 5, 2025, Stride touted the strength of its performance in its earnings call reviewing the fourth quarter of its Fiscal Year 2025, concluding on June 30, 2025. On this call, Mr. Rhyu stated the following:

The good news is that macro trends around our core business continue to be positive. Demand for school choice is growing, and our customers and potential customers continue to choose us in record numbers. Given where we are, less than 50% through our anticipated enrollment season, we can already see if current trends continue that we will once again achieve double-digit enrollment growth this fall. And we are continuing to invest in new products and services. This will both benefit our core business but also give us new market opportunities to pursue. For example, over the past year, our tutoring business hosted over 100,000 sessions. In this upcoming school year, we are going to offer dedicated tutoring for all second and third graders focused on the core skill of reading.

100.    On the same call, Ms. Blackman stated the following:

This year was another record year for Stride with continued strong revenue and profitability growth. And while it's still early in the enrollment season, given that historically August and September are our busiest months, we are on track for another year of strong growth in FY '26. And as we've done in the past, we'll wait until the first quarter earnings to provide formal enrollment guidance. However, I'd like to add a little color to the comments James made about our anticipated enrollment growth for the first quarter.

Based on our latest data, we expect year-over-year enrollment growth to be in the range of 10% to 15% in the first quarter. It's still early in August, and we will need to continue to execute against what we believe is a strong market trend. A few additional notes for FY '26. Seasonality for next year should be in line with FY '25.

SG&A as a percent of revenue should continue to decrease marginally, while CapEx as a percent of revenue is anticipated to be relatively flat. Stock-based compensation will increase slightly from this year, and interest expense and the tax rate should be in line with FY '25.

101. On the same call, Mr. Rhyu was asked about Gallup-McKinley County Schools terminating its contracts with Stride. He responded with the following:

So let me try to unpack this here a little bit. When we encountered the difficulties with the Gallup-McKinley school district, we were uncertain about how those families were going to be able to continue in a program and -- period. Like we just -- we didn't have enough information sort of broadly whether it was going to be ours or theirs or whatever. And so we made a decision to offer those families a spot in a comparable private academy in New Mexico. And our view of it was that we were going to invest in those families irrespective of sort of whatever contractual outcome happened because it was important to us to make sure that we protected those families.

Our team did an amazing job in securing these contracts. And so those families now have, I'll say, a more secure home, if you will, in a similar environment, if you will, than they were previously in. But we did make an offer, and that would have been an investment on our part for these families. It also, by the way, ensured teachers that we employed in New Mexico were able to retain their jobs, which was also important to us, which we also made that decision at potentially investment on our part. Now it's all worked out. But we made that decision before we knew it was going to work out because it was the right thing to do for the families and for the teachers in that state. And we stood by them, and I think they're now standing by us.

But it was dicey. It was difficult. We were not sure that we were going to secure a new set of agreements. Shout out to the districts that signed up with us. I think they worked very quickly and diligently as well. So thank you to them. And I think we've all got the same goals in mind here, which is to ensure seamless education opportunities for those families. And that's -- we've been able to come together and provide that. And we're very grateful for that opportunity to serve those families.

102. On the same call, Mr. Rhyu was presented a follow-up question about how Stride would fill the hole left by the 4,000 students that departed Stride due to the contract termination by Gallup-McKinley County Schools. He responded with the following:

20

We anticipate no hole to fill. And yes, you have the numbers directionally right. It would have been something probably less than 2% of the total that we would have, in theory, had at risk. But we feel pretty confident that New Mexico is a really strong demand state. We see a lot of demand in that state. We think we're going to continue to perform very well in that state, and we think that the families have really recognized us as the premier operator in that state.

103. On the same call, Ms. Blackman stated that Stride "expect[s] year-over-year enrollment growth to be in the range of 10% to 15% in the first quarter [of Fiscal Year 2026, running from July 2025 to September 2025]."

104. Yet on the October 28, 2025, earnings call recapping the first quarter of Fiscal Year 2026, Mr. Rhyu explained that Stride had "approximately 10,000 to 15,000 fewer enrollments" than originally anticipated:

Demand for our products and services remain strong. In fact, we believe industry demand and trends around online education continue to grow. We indicated in August that we believe we would grow enrollment between 10% to 15%. And while we achieved enrollment growth in that range, we still fell short of our internal expectations. While demand as indicated by application volumes remains healthy, overall growth was tempered. Well, what happened? Well, we made a couple of strategic decisions that we believe will pay dividends over the longer term, but limited our growth in the short term.

First, we invested in upgrading our learning and technology platforms with third-party industry-leading platforms. We continue to believe the investment is the right long-term decision to ensure we are deploying industry-leading technologies and systems. However, the implementations did not go as smoothly as we anticipated. We are actively engaged with our vendors to improve the situation. We heard from our customers that their engagement with these platforms detracted from their overall experience. This poor customer experience has resulted in some higher withdrawal rates and lower conversion rates than we expected.

Secondly, we wanted to focus on running high-quality programs. And in some instances, the best approach to achieve that is to limit enrollment growth while we improve our execution. We estimate that the combination of these factors resulted in approximately 10,000 to 15,000 fewer enrollments than we otherwise could have achieved. We also believe that these challenges will likely restrict our in-year enrollment growth. While demand continues to remain strong, we do not anticipate

the same in-year enrollment increases that we have seen over the past few years. So our outlook for this year compared to last year is a bit muted. However, our outlook for this business over the longer term remains bullish, and these investments should help us achieve our longer-term goals.

105.    Also on the October 28, 2025, earnings call, Ms. Blackman stated the following:

We did not give guidance for the full year. We gave the guidance that we gave for the count date was 10% to 15% for the count date, we came in at 11.3%. But we do not anticipate that we will see the same level of in-year enrollment growth that we've seen over the past three years. So based upon that assumption, the 11.3% growth that we saw from October to October, we don't expect to see that same year-over-year increase by the end of the year.

106.    Shortly before the October 28, 2025, earnings call, on October 24, 2025, Stride issued a false and misleading proxy statement ("2025 Proxy") that sought the votes of shareholders to re-elect Stride's Board of Directors.

107.    The directors oversaw and approved the drafting and submission of the 2025 Proxy before it was filed with the SEC and distributed to Stride's shareholders.

108.    The directors issued materially misleading statements in the 2025 Proxy.

109.    The 2025 Proxy stated:

Our Board believes full and open communication with management is essential for effective enterprise risk management and oversight. Members of our Board discuss strategy and risks facing the Company with our CEO and our senior management at meetings of the Board, or when members of our Board seek to focus on a particular area of risk. Because our CEO and Executive Chair of the Board set the agenda for Board meetings, in consultation with our Lead Independent Director, each functional division of the Company can identify and bring to our Board's or Board committees' attention risk-related topics that may require added focus, which have included: evolving state curriculum standards, student engagement and retention, education technology, legal and policy matters, information security and succession planning. Our CEO also periodically presents to our Board on the strategic, financial and operational issues facing the Company, which frequently includes a review of associated risks and opportunities.

Management is responsible for identifying, prioritizing, remediating and monitoring the day-to-day management of risks that the Company faces and applying the Company's disclosure controls and procedures, while our Board, as a

22

whole and through its committees, is responsible for the oversight of enterprise risk management. In fiscal 2025, the Audit Committee continued to work directly with a major independent accounting firm to support the Company's internal audit function in risk management. This combination provides us with the focus, scope, expertise, alignment and continuous attention necessary for effective risk management and disclosures.

While our Board is ultimately responsible for risk oversight, three of its committees concentrate on specific risk areas:

The Audit Committee oversees financial reporting and internal controls, school and corporate compliance, cybersecurity and operations risk and discusses with management the Company's policies with respect to those matters. Our internal audit department prepares risk management reports that are provided to the Audit Committee on a quarterly basis, or as needed. The Audit Committee receives regular reports from management, including the Chief Information Security Officer, on our cybersecurity risks. In addition, management updates the Committee on any cybersecurity incidents it considers to be significant or potentially significant. The Audit Committee reports to the full Board regarding its activities, including those related to cybersecurity. In addition, the Audit Committee assists the Board in the oversight of legal risk management.

A Legal Compliance and Ethics Committee (consisting of senior management members) maintains a Legal Compliance and Ethics Program, which includes a Chief Compliance Officer. The Legal Compliance and Ethics Committee provides reports to the Audit Committee on the Company's legal risks and compliance related matters in the schools we serve and at the corporate level. Our Compensation Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs and retains outside compensation and legal experts for that purpose.

Finally, our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risks associated with the organization, membership and structure, or design, of the Board, succession planning and corporate governance. The Board committees may retain independent counsel, experts or advisors as provided for in their charters, and the Board as a whole has access to such advisors and such other independent advisors that the Company retains or that the Board considers necessary to discharge its responsibilities, including in connection with risk oversight.

110. Both the 2024 Proxy and 2025 Proxy informed shareholders that Stride's leadership appreciated the risks Stride faced and supervised Stride's related risk exposure and mitigation actions.

111. But Stride's directors actually failed to supervise Stride in this manner, permitting Stride's operations to disregard both compliance and the avoidance of legal risk.

112. As a result of the failures of Stride's leadership, Stride issued materially false statements in its 2024 and 2025 Proxies.

113. Due to these misleading statements, Stride's shareholders—both uninformed and deceived—voted to re-elect Stride's leadership.

**D.     Stride's True Practices Reveal that Its Public Statements Were Misleading.**

114. Despite the positive reports, the foregoing statements identified in Paragraphs 82-87, 91-105, and 109 materially misrepresented the actual enrollment figures at Stride.

115. Upon information and belief, Stride has a deceptive practice of inflating its enrollment numbers with "ghost students."

116. On August 27, 2025, the Board of Education for the Gallup-McKinley County Schools (the "GMCS Board") filed a complaint against Stride.

117. Confirming RSA Plaintiffs' observations, the GMCS Board alleged that Stride had delayed reports of student departures by months.

118. The delay in such reports allowed Stride to wrongfully obtain public monies to educate a certain number of students, when in fact fewer remained in the program.

119. Stride listed notes with such delayed reports, including "absent for 10 consecutive days," "student never started with K12," and "moved out of state," among others.

120.     Furthermore, upon information and belief, Stride assigned teachers disproportionately large class sizes in comparison with required state thresholds and caps.

121.     The GMCS Board alleged that Stride had intentionally made its student-to-teacher ratio disproportionately large to the point that it exceeded state law.

122.     According to the GCMS Board, Stride knew or should have known it was violating the required student-to-teacher ratios specified under N.M. Stat. Ann. § 22-10A-20 (2003) and a related board policy.

123.     The GCMS Board also alleged that Stride's corporate leadership had been on notice of its improper ratios for two years, since September 30, 2023.

124.     The GCMS Board raised other concerns, including a significant drop in graduation rate, significant increase in student turnover, and disproportionate counselor-to-student ratios, among other misrepresentations and legal violations.

125.     Therefore, Stride did not have dialogue to raise student-to-staff ratio caps with government entities—it merely ignored the government-imposed limits.

126.     Because Stride misled investors by purporting to have continually increasing enrollments until the Fall of 2025 when the Gallup-McKinley news broke, the value of RSA Plaintiffs' RSAs were substantially harmed.

127.     Because Stride's leadership was aware of these enrollment inflation practices, it was recklessly or intentionally misrepresenting the actual enrollment figures.

128.     Plaintiffs' direct observations during the course of their engagement further confirmed that Stride's public representations regarding its risk oversight, compliance, and the privacy of student information were materially misleading. As alleged above, Plaintiffs identified that Stride was retaining and transmitting student-level data in an insecure manner, including in

25

repositories that should not have contained such data, in a manner inconsistent with the privacy obligations Stride publicly represented to its shareholders. Plaintiffs further observed a widespread acknowledgment among Stride's senior personnel that core operational and information-technology systems were not functioning as represented. These conditions are inconsistent with Stride's repeated public representations that its Audit Committee, Chief Information Security Officer, and senior leadership were actively supervising and remediating Stride's compliance, cybersecurity, and student-privacy risks.

129.    Plaintiffs' direct observations also revealed that Stride had concealed from the investing public a recurring, catastrophic failure of a core component of its learning management system.

130.    In or around the summer of 2024, Stride attempted a migration of a key learning-management-system component (the "PowerSchool migration").

131.    The migration failed and was fully "rolled back" that same summer, materially degrading the user experience for Stride's customers.

132.    Despite the magnitude and operational significance of the 2024 rollback, Stride did not disclose the failed migration or its consequences to the investing public. To the contrary, Stride's senior management thereafter publicly represented to investors that Stride had "fixed [its] execution problems"—statements that were materially false when made, given Stride's then-existing knowledge that the core LMS migration had been wholly reversed.

133.    In or around the summer of 2025, the same migration failure repeated, again causing significant degradation of the user experience and prompting users to begin departing the platform in reportable numbers. Stride continued throughout this period to publicly maintain a

bullish narrative regarding the integrity and performance of its core product offerings, omitting any disclosure of the recurring rollback or the user attrition it caused.

134. Stride did not publicly acknowledge the resulting impairment until its October 28, 2025 earnings call, when Mr. Rhyu attributed enrollment shortfalls in part to "poor customer experience" and "higher withdrawal rates"—the very conditions that the recurring migration failures had caused and that Stride's leadership had known about for approximately fifteen (15) months.

135. Had Stride timely disclosed these material technological failures, Plaintiffs would not have agreed to enter into the multi-year SOW 2 and ICA SOW 1 engagements, and RSA Plaintiffs would not have accepted compensation in the form of restricted stock awards whose value depended on the integrity of the very LMS components Stride knew to have been compromised.

136. Stride's leadership was contemporaneously aware of the materiality of these undisclosed product failures and acted to suppress information that might prompt insider sales of Stride securities. In or around March or April of 2025, Ms. Gruneberg told Mr. Scott and Mr. Morton, in an unsolicited and unprompted statement, "don't sell your shares."

137. Ms. Gruneberg's statement, made approximately six months before Stride's October 28, 2025 disclosure of the enrollment and execution shortfalls, is evidence of Stride's knowledge that material adverse information had not yet been disclosed to the market and that the inflated trading price of Stride securities was vulnerable to a downward correction. Mr. Scott and Mr. Morton, both of whom held or were entitled to RSAs that such a correction would impair the value of, relied upon Ms. Gruneberg's statement in continuing to render services and in declining to take protective action.

E.     **Stride's Misrepresentations Were Made in Connection with a Purchase of Stride RSAs with RSA Plaintiffs' Services.**

138.   RSA Plaintiffs contracted with Stride to exchange their services for compensatory securities—namely, Stride's restricted stock awards ("RSAs").

139.   Upon information and belief, on August 19, 2024, Stride entered into Independent Consulting Agreements ("ICAs") with each RSA Plaintiff: Mr. Scott, Mr. Morton, Mr. Schmitz, and Mr. Magalhães.

140.   Upon information and belief, also on August 19, 2024, Stride and each RSA Plaintiff incorporated into their RSA ICAs a "Statement of Work No. 1" ("ICA SOW 1").

141.   The ICA SOW 1 specified, in relevant part, that: "Contractor will receive a grant of a Company restricted stock award, subject to terms and conditions set forth in the Restricted Stock Award Grant Notice and Restricted Stock Award Agreement,[1] dated as of the date hereof (the "Award"), in an amount equal to [amount varies by RSA Plaintiff] U.S. Dollars. The Contractor agrees that a termination of this SOW, the [Independent Consultant] Agreement, or both the SOW and the [Independent Consultant] Agreement, shall be deemed a Termination of Service as such term is defined in the Company's 2016 Equity Incentive Award Plan,[2] as amended, and any unvested shares under the Award shall be forfeited."

142.   Each Plaintiff received from Stride an RSA in an agreed-upon U.S. Dollar amount as set forth in the applicable Statement of Work, and allegedly, in its Grant Notice.

---

[1] *See* Stride, Inc., K12 Inc. Restricted Stock Award Agreement (Rev. 03.28.2017) (incorporated and linked from Stride, Inc., SEC S-8 Filing (Aug. 7, 2024)).

[2] *See* Stride, Inc., Schedule 14A, App'x B (Oct. 26, 2022) (incorporated and linked from Stride, Inc., SEC S-8 Filing (Aug. 7, 2024)).

143. Section 2.1(a) of the Restricted Stock Award Agreement described above, fully known as the "K12 Inc. Restricted Stock Award Agreement" (Rev. 03.28.2017), states that Stride issues such Awards for the Participant's agreement to remain in Stride's service and for other good and valuable consideration, "which exceeds the aggregate par value of the Shares subject to the Award . . . as of the Date of Grant . . . . The number of shares of Restricted Stock . . . subject to the Award is set forth in the Grant Notice."

144. In other words, Stride designated a unique number of restricted stock shares to each of the RSA Plaintiffs on the date the RSAs were granted, and each of these unique numbers of shares corresponded to the dollar amount listed on the ICA SOW 1 of each RSA Plaintiff.

145. From the grant date onward, the number of shares assigned to each RSA Plaintiff remained constant, but the value of the shares fluctuated with Stride's stock performance in the stock market.

146. The ICA SOW 1 also specified, in relevant part, that: "The above payments are for retained services, and in advance of receipt and acceptance of Services and Deliverables in accordance with section 4 of the [Independent Consultant] Agreement. The compensation provided for the Services and Deliverables set forth in this SOW constitutes full consideration for the Services and Deliverables. In addition to any conditions set forth in the [Independent Consultant] Agreement or this SOW, the Award is conditioned upon providing the proper documentation to establish an E*TRADE account for the deposit of such shares under the Award."

147. The ICA SOW 1's section 4, "Services Duration / Term of This Statement of Work," stated the following: "Contractor will commence work on or about the 19th day of August 2024 and shall continue until the 19th day of August 2027. The efforts herein shall be primarily performed remotely."

148.    RSA Plaintiffs were willing to invest three years of labor into Stride for their RSA to gradually vest and convert to equity.

149.    Nevertheless, on November 19, 2025, Stride terminated each RSA Plaintiff's ICA and corresponding ICA SOW 1 for convenience.

150.    Upon information and belief, each RSA Plaintiff's ICA and ICA SOW 1 were terminated to prevent each RSA from vesting according to the vesting schedule set by Stride for each RSA Plaintiff.

**F.      Relying On Stride's Public Statements and the Market, Plaintiffs Chose to Exchange Services for RSA Compensation.**

151.    During the period leading up to RSA Plaintiffs' Independent Consultant Agreement start dates through the termination of these contracts, Stride securities were traded on the New York Stock Exchange (NYSE), an active and efficient market.

152.    RSA Plaintiffs, responsible for Silicon Dales' work with Stride, were aware of the substantial monthly compensation that Stride paid Silicon Dales under the entities' mutual Master Services Agreement and its Statement of Work 1 dated February 19, 2024 through August 19, 2024.

153.    Around and during this time, RSA Plaintiffs observed that the stock performance between January 2024 and August 2024 improved substantially.

154.    On February 20, 2024, the first business day of RSA Plaintiffs' work under Silicon Dales' Statement of Work 1, LRN opened on the NYSE at $56.80 per share of stock.

155.    On August 19, 2024, the last day of RSA Plaintiffs' work under Silicon Dales' Statement of Work 1 and the day they contracted for their restricted stock awards, LRN opened on the NYSE at $82.06 per share of stock.

156.    The below graphic demonstrates the increase in stock price from the start of Silicon Dales' Statement of Work 1 until its completion, the day RSA Plaintiffs contracted with Stride for their RSAs:



**FIGURE 1: LRN STOCK PRICE, 02/19/2024 - 08/19/2024**

157.    RSA Plaintiffs believed Stride's reporting and the stock market's reports that Stride's stock was performing exceedingly well and would continue to have a good outlook.

158. Knowing that RSA Plaintiffs' services would only improve the quality of Stride's products, likely resulting in Stride's increased profitability, RSA Plaintiffs were amenable to Stride's offer to compensate them with restricted stock awards.

159. RSA Plaintiffs relied on the market's integrity and Stride's statements in their decisions to enter into service contracts for Stride that provided each of them with RSAs as compensation.

160. The RSAs were valued at prices artificially inflated by Stride's material misrepresentations.

161. At the time RSA Plaintiffs entered into their contracts with Stride, the actual values of the total acquired Stride restricted stock units were far lower than the values for which RSA Plaintiffs contracted in exchange for their services.

**G.      Plaintiffs Suffered Economic Loss Because of Stride's Misrepresentations.**

162. On or around September 14, 2025, news outlets circulated that Gallup-McKinley County Schools Board of Education had sued Stride, alleging among other things fraud, intentional and tortious misconduct, and other violations of law.

163. The reports included the Complaint's allegations of inflated enrollment numbers and ignored legal compliance, including the disproportionate student-to-teacher ratios.

164. As a result, Stride's stock price dropped $18.60 per share—by 11.7%—with the value at $139.76 per share by market close on September 15, 2025.

165. On October 28, 2025, once Stride's leadership mentioned in its Fiscal Year 2026 Quarter 1 earnings call the "poor customer experience" that deterred students and drove "lower conversion rates" and "higher withdrawal rates," in addition to the 10,000-15,000 fewer enrollments that made the company's performance look "muted" compared to prior years, Stride's

32

stock price sunk by $83.48 per share—more than 54%—to $70.05 per share at market close on October 29, 2025.

166.    Upon information and belief, the RSA Plaintiffs' contracts were purportedly terminated only a few weeks later, on or around November 19, 2025, before the shares could further vest.

167.    Upon information and belief, Stride terminated RSA Plaintiffs in bad faith for the purpose of preventing the vesting of their RSAs.

168.    If this Court determines that the termination of RSA Plaintiffs must be voided and their RSAs restored, then the value of each RSA has been harmed by Stride's material misrepresentations concerning its company performance and practices.

169.    Because Stride materially misrepresented its practices, the value of the RSAs has been significantly damaged, and RSA Plaintiffs have suffered economic loss as a result.

170.    Even if this Court determines that the termination of RSA Plaintiffs is valid, RSA Plaintiffs would never have entered the transaction.

171.    Therefore, if the Court determines that each RSA Plaintiff has spent upwards of a year providing Stride with services in exchange for no compensation, Stride's material misrepresentation that induced their agreement still entitles them to recovery of the value of the services contributed to Stride.

### H.    Stride's Misrepresentation Caused Plaintiffs' Loss.

172.    Stride's wrongful conduct, alleged above, proximately caused the economic loss suffered by RSA Plaintiffs.

173.    On or around September 14, 2025, the market price of Stride securities declined abruptly upon the news of the Gallup-McKinley County Schools allegations.

174. On October 28, 2025, at the next Stride earnings call, Stride admitted that its enrollment numbers fell well short of projections, by 10,000 to 15,000 enrollments.

175. The announcement immediately resulted in a reduction in Stride stock value by approximately half.

176. The release of the Complaint by Gallup-McKinley County School Board and Stride's poor enrollment performance for the quarter revealed the true poor performance that the company had in enrollments.

177. Public awareness of the true poor enrollment statistics made Stride's stock price fall precipitously.

178. The graphic below of Stride's stock performance between August 1, 2024 and December 31, 2025 demonstrates the precipitous drop resulting from Stride's admission of lower enrollment rates and customer satisfaction.



**FIGURE 2: LRN STOCK PRICE, 08/01/2024-12/31/2025**

## VI.   CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
### (Silicon Dales)

179.   Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

180.   Silicon Dales brings this Count for breach of contract under Virginia law.

181.   On or about February 19, 2024, Silicon Dales and Stride entered into a Master Services Agreement ("MSA"), pursuant to which Silicon Dales agreed to provide consulting and software development services to Stride in exchange for compensation.

182. On or about August 19, 2024, Silicon Dales and Stride entered into Statement of Work No. 2 ("SOW 2") pursuant to the MSA, under which Silicon Dales agreed to provide a full-time team dedicated to providing services and deliverables exclusively to Stride for a term of 36 months, from August 19, 2024 through August 18, 2027, in exchange for monthly compensation in an amount set forth in SOW 2.

183. On or about December 9, 2024, Silicon Dales and Stride entered into Statement of Work No. 3 ("SOW 3") pursuant to the MSA, under which Silicon Dales agreed to design, implement, test, and deploy replacement applications of Testing Nirvana and Related Services Manager for Stride.

184. Section 2 of the MSA provides that invoices shall be paid "net 45 days after receipt of the applicable undisputed invoice."

185. Silicon Dales fully performed its obligations under the MSA, SOW 2, and SOW 3, providing the services and deliverables required thereunder.

186. On November 17, 2025, Stride materially breached the MSA and SOW 3 by failing to remit payment for SOW 3 Invoice No. 242833 within the required 45-day payment window.

187. On November 19, 2025, while in material breach of the MSA due to non-payment, Stride purported to terminate the MSA and SOW 2 for convenience, effective December 19, 2025.

188. Under Virginia law, a party in material breach of a contract is barred from enforcing termination provisions against the non-breaching party. Stride's purported termination for convenience was therefore void ab initio, and the MSA and SOW 2 remain in full force and effect.

189. Alternatively, even if Stride's termination were valid, Stride materially breached the MSA and SOW 2 by failing to provide the required 30-day notice before terminating SOW 2.

36

Section 11(b) of the MSA provides that Stride may terminate "for its convenience by providing Contractor with a thirty (30) day prior written notice of its intention to terminate for convenience."

190.    Additionally, Stride breached its implied covenant of good faith and fair dealing by terminating the agreements in bad faith, shortly before significant compensation was due and in retaliation for Plaintiffs raising concerns about Stride's non-payment and other internal dysfunction.

191.    As a direct and proximate result of Stride's breaches, which deprived Silicon Dales of its reasonably expected contractual benefits, Silicon Dales has suffered damages including, but not limited to: (a) the full remaining value of the 36-month SOW 2 contract through August 2027, in an amount to be proven at trial; (b) reliance damages for costs incurred in scaling its workforce and business operations based on written and verbal representations regarding the long-term duration of the engagement; and (c) restitution for the strategic value retained by Stride without proper payment.

### COUNT II – BREACH OF CONTRACT
### (RSA Plaintiffs)

192.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

193.    RSA Plaintiffs bring this Count for breach of contract under Virginia law.

194.    On or about August 19, 2024, each RSA Plaintiff entered into an Independent Consulting Agreement ("ICA") with Stride, pursuant to which each RSA Plaintiff agreed to provide consulting services to Stride.

195.    Also, on or about August 19, 2024, Stride and each RSA Plaintiff incorporated into their individual ICAs a "Statement of Work No. 1" ("ICA SOW 1"), which specified that each RSA Plaintiff would receive a grant of a Company restricted stock award ("RSA") as

37

compensation for services, with a term continuing until August 19, 2027—a 36-month engagement.

196.    The RSA amounts received by each RSA Plaintiff was specified within their respective Grant Notice and ICA SOW 1.

197.    Each RSA Plaintiff fully performed his obligations under his respective ICA and ICA SOW 1, making himself available at least 40 hours a week to execute against identified product acceleration projects and providing the required services and deliverables.

198.    On or about November 19, 2025, Stride purported to terminate each RSA Plaintiff's ICA and ICA SOW 1 for convenience, effective December 19, 2025.

199.    Upon information and belief, Stride terminated the RSA Plaintiffs' agreements in bad faith and solely to prevent their RSAs from vesting according to Stride's vesting schedules, thereby depriving RSA Plaintiffs of the compensation they had earned through their services.

200.    Stride breached its implied covenant of good faith and fair dealing inherent in each ICA by terminating the RSA Plaintiffs' agreements strategically to prevent the vesting of their equity compensation, thereby depriving them of the benefit of their bargain.

201.    Stride's termination of the RSA Plaintiffs' agreements, timed to prevent the vesting of their equity compensation after they had provided over a year of services, constitutes a material breach of the ICAs and the implied covenant of good faith and fair dealing.

202.    As a direct and proximate result of Stride's breaches, RSA Plaintiffs have suffered damages including, but not limited to (a) consequential damages arising from Stride's breaches; (b) the full value of the RSAs, or if this Court finds that part of the RSAs did not vest, (i) the value of the unvested RSAs that would have vested had Stride not wrongfully terminated the agreements, and (ii) the value of the services each RSA Plaintiff contributed to Stride from August 19, 2024

through the date of termination, for which they received no compensation due to Stride's bad faith termination.

**COUNT III – BREACH OF CONTRACT**
**(RSA Plaintiffs – Failure to Issue and Honor Restricted Stock Awards)**

203.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

204.    RSA Plaintiffs bring this Count for breach of contract under Virginia law. This Count is pled in the alternative to, and independently from, Count II and any other claim asserted herein.

205.    On or about August 19, 2024, Stride entered into a separate Independent Consulting Agreement ("ICA") with each of Mr. Scott, Mr. Morton, Mr. Schmitz, and Mr. Areias, and, on the same date, Stride and each RSA Plaintiff incorporated into his respective ICA a Statement of Work No. 1 (each, an "ICA SOW 1"). The ICAs and the ICA SOW 1s are valid and enforceable contracts supported by adequate consideration.

206.    Section 3 of each ICA SOW 1 ("Payment and Rates") contains the following operative grant language: "Contractor will receive a grant of a Company restricted stock award, subject to terms and conditions set forth in the Restricted Stock Award Grant Notice and Restricted Stock Award Agreement, dated as of the date hereof (the 'Award'), in an amount equal to [the amount specified in each RSA Plaintiff's ICA SOW 1] U.S. Dollars."

207.    By the plain terms of Section 3 of each ICA SOW 1, the "Award" — *i.e.*, the restricted stock award itself — was "dated as of the date hereof," meaning that the Award became effective on August 19, 2024, contemporaneously with the execution of the corresponding ICA SOW 1. The grant of the Award was not deferred to, or made contingent upon, the issuance of any future Restricted Stock Award Grant Notice or Restricted Stock Award Agreement.

208.    The only condition that Section 3 of each ICA SOW 1 imposes on the Award is administrative in nature: "In addition to any conditions set forth in the [Independent Consultant] Agreement or this SOW, the Award is conditioned upon providing the proper documentation to establish an E*TRADE account for the deposit of such shares under the Award." No other separate or subsequent grant instrument is required, contemplated, or referenced as a condition precedent to the grant of the Award.

209.    Each ICA further provides, at Section 24, that the ICA "together with any SOWs, sets forth the entire Agreement between the parties with respect to the subject matter hereof, and it may only be changed by a writing signed by both parties." No subsequent writing signed by both parties modified Section 3 of any ICA SOW 1, and no subsequent writing eliminated, deferred, or further conditioned the immediately effective grant of any RSA Plaintiff's Award.

210.    Each RSA Plaintiff fully performed his obligations under his respective ICA and ICA SOW 1, including by satisfying (or standing ready, willing, and able to satisfy) the E*TRADE documentation condition and by performing the consulting services required of him on a continuous basis from August 19, 2024 through the purported date of termination.

211.    Notwithstanding that the Award was effective on August 19, 2024 by the plain terms of each ICA SOW 1, Stride never separately issued any RSA Plaintiff a Restricted Stock Award Grant Notice or a Restricted Stock Award Agreement. The instrument that operatively constituted the grant of each RSA Plaintiff's Award was, and remains, Section 3 of their respective ICA SOW 1.

212.    Stride breached its obligations under each RSA Plaintiff's ICA and ICA SOW 1 by, *inter alia*: (a) failing to deliver to each RSA Plaintiff the restricted stock award in the U.S. Dollar amount specified in his ICA SOW 1 as of August 19, 2024; (b) failing to issue and deliver

40

any Restricted Stock Award Grant Notice or Restricted Stock Award Agreement reflecting the Award; and (c) refusing to honor the Award following Stride's purported November 19, 2025 termination notices.

213. Stride's purported invocation of Section 2.2 of the 2016 Equity Incentive Award Plan to forfeit "unvested shares under the Award" does not excuse Stride's breach. Because each RSA Plaintiff's Award was effective as of August 19, 2024 by the plain terms of his ICA SOW 1, Stride was contractually obligated to issue the full Award (in the agreed U.S. Dollar amount) regardless of the validity or invalidity of any subsequent termination.

214. As a direct and proximate result of Stride's breaches alleged in this Count, each RSA Plaintiff has suffered damages including, but not limited to: (a) the full U.S. Dollar value of his Award as specified in his respective ICA SOW 1; (b) consequential damages arising from Stride's failure to issue and honor the Award; and (c) pre-judgment and post-judgment interest, in each case in an amount to be proven at trial.

### COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (All Plaintiffs)

215. Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth fully herein.

216. Virginia law implies in every contract a covenant that each contracting party will act in good faith and deal fairly with the other in the performance and enforcement of the contract. The implied covenant prohibits a party from exercising contractual discretion in a manner that destroys or injures the right of the other party to receive the fruits of the contract.

41

217.    Each of the MSA, SOW 2, SOW 3, the ICAs, and the ICA SOW 1s—being valid and enforceable Virginia contracts—is subject to the implied covenant of good faith and fair dealing.

218.    Stride breached the implied covenant of good faith and fair dealing by, *inter alia*: purporting to terminate the agreements "for convenience" before the RSA Plaintiffs' restricted stock awards continued to vest and before Silicon Dales could realize the full value of the 36-month engagement; inducing Plaintiffs to perform additional foundational work on the Tallo and other portfolio-company engagements while contemporaneously planning to terminate Plaintiffs at the moment such work was delivered; misrepresenting to Plaintiffs that critical project deadlines had been set by third parties—including representations that the Tallo deadline had been set by Tallo's chief executive officer—when in fact those deadlines had been engineered internally by Stride personnel for purposes of facilitating Stride's planned termination; issuing a "prorated" final payment to Silicon Dales for services rendered into December 2025, while simultaneously asserting that the agreements had been validly terminated as of November 19, 2025—conduct admitting Silicon Dales' continued contractual performance while denying Silicon Dales the benefit of its bargain; and purporting to extinguish each RSA Plaintiff's rights under the 2016 Equity Incentive Award Plan in connection with the November 19, 2025 termination notices, despite Stride's lack of any contractual right to terminate the Plan as to the affected individuals.

219.    Stride's foregoing conduct was undertaken in bad faith and constituted a use of contractual discretion that was arbitrary, dishonest, and inconsistent with the parties' justified expectations under the agreements.

220.    As a direct and proximate result of Stride's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages including, but not limited to: (a) the

full remaining value of the SOW 2 engagement through August 2027; (b) the full U.S. Dollar value of each RSA Plaintiff's restricted stock award; (c) the value of services rendered by Plaintiffs after Stride's manufactured "termination," for which they received no, or inadequate, compensation; and (d) consequential damages, in each case in an amount to be proven at trial.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Silicon Dales)

221. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

222. At all relevant times, Silicon Dales maintained valid, ongoing business relationships with Stride's portfolio companies, including Tallo, Inc. ("Tallo"). Silicon Dales provided technology consulting and software development services to Tallo pursuant to statements of work governed by the Master Services Agreement between Silicon Dales and Stride.

223. Silicon Dales also maintained a reasonable expectation of continuing and expanding its business relationship with Tallo. Silicon Dales had developed strong working relationships with Tallo's leadership, including CEO Allison Danielson and CMO Eric Meadows, and had a reasonable expectation of continued engagement based on the quality of its work and positive feedback from Tallo personnel.

224. Todd Goldthwaite, Stride's General Manager of Portfolio Companies, had actual knowledge of Silicon Dales' business relationships and business expectancies with Tallo and other Stride portfolio companies.

225. During July and August 2025, Silicon Dales observed that roadmaps for ongoing projects were being inexplicably stalled by Stride management. In response, Silicon Dales pitched an alternative product solution directly to Mr. Rhyu. During a 30-minute call, Mr. Rhyu expressed

43

interest in "investing" in the proposal and agreed with Silicon Dales' assessment regarding the company's technology needs.

226.    Despite the CEO's expressed interest, Mr. Goldthwaite and Ms. Gruneberg reacted with extreme hostility to Silicon Dales' direct communication with Stride's CEO. Within moments of each other, Mr. Goldthwaite and Ms. Gruneberg rejected the outlined proposal via an email thread that included Mr. Rhyu, Ms. Blackman, Ms. Gruneberg, Mr. Goldthwaite, and Mr. Scott—with no further analysis or exploration of the idea.

227.    Immediately following Silicon Dales' pitch to the CEO, Mr. Goldthwaite intentionally and improperly interfered with Silicon Dales' business relationship with Tallo. Specifically, Mr. Goldthwaite contacted Mr. Meadows and Ms. Danielson to complain about Silicon Dales.

228.    Upon information and belief, Mr. Goldthwaite's communications to Tallo leadership were designed to destroy Silicon Dales' reputation and business relationship with Tallo and insulate the dysfunction attributable to Mr. Goldthwaite from further scrutiny from Plaintiffs. Mr. Goldthwaite's actions were not motivated by any legitimate business purpose, but rather by personal animus toward Silicon Dales arising from: (a) Silicon Dales' prior disclosure of operational inefficiencies at Stride MedCerts, which led to the termination of MedCerts' Craig Sprinkle; and (b) Silicon Dales' direct communication with Stride's CEO, which Mr. Goldthwaite perceived as a threat to his internal authority.

229.    Two Tallo executives messaged Mr. Scott at the time, expressing surprise at the extreme and disproportionate nature of Mr. Goldthwaite's treatment of Plaintiffs. The Tallo executives' surprised and contemporaneous communications confirm that Mr. Goldthwaite's conduct was abnormal, hostile, and damaging to Silicon Dales' reputation.

44

230. Mr. Goldthwaite's conduct was not privileged. Although Mr. Goldthwaite was a Stride employee, his actions were motivated by personal animus and were not undertaken in good faith to advance any legitimate business interest of Stride or Tallo. Mr. Goldthwaite's conduct exceeded the scope of any qualified privilege that might otherwise apply to intra-corporate communications.

231. As a direct and proximate result of Mr. Goldthwaite's tortious interference, Silicon Dales' business relationship with Tallo was damaged. Silicon Dales lost the benefit of its positive working relationship with Tallo leadership and suffered harm to its professional reputation.

232. Mr. Goldthwaite's interference was part of a broader pattern of conduct designed to sabotage Silicon Dales' ability to operate and to manufacture pretextual grounds for termination. Having failed to induce Silicon Dales to commit a performance failure, Stride ultimately resorted to an invalid "Termination for Convenience" issued while Stride was in material breach of its payment obligations.

233. Stride is vicariously liable for Mr. Goldthwaite's tortious interference. Mr. Goldthwaite's actions were taken within the scope of his employment as General Manager of Portfolio Companies and were ratified by Stride's subsequent termination of Silicon Dales' agreements.

234. Alternatively, Stride is directly liable for tortious interference because Mr. Goldthwaite's conduct was undertaken with the knowledge and approval of Stride's senior leadership, including Ms. Gruneberg, and was consistent with Stride's broader strategy to terminate Silicon Dales while extracting maximum value from its services.

235. As a direct and proximate result of Stride's tortious interference, Silicon Dales has suffered damages, including but not limited to: (a) loss of business relationships and expectancies

with Tallo and other Stride portfolio companies; (b) harm to Silicon Dales' professional reputation; (c) lost profits from future engagements that Silicon Dales reasonably expected to obtain; and (d) consequential damages.

## COUNT VI – FEDERAL SECURITIES FRAUD
### (RSA Plaintiffs)

236.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

237.    RSA Plaintiffs bring this Count under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

238.    Stride made numerous false statements of material fact to the public concerning its company's practices and performance, as described more fully above, including but not limited to: (1) misrepresenting its enrollment figures, (2) exploiting an abnormally large student-to-teacher ratio, even to the violation of state law, despite informing the public about handling enrollment caps through dialogue, and (3) delaying reporting of student enrollment departures and student-to-teacher ratios.

239.    Stride's leadership acted with scienter because each of these false representations were intentionally or recklessly made by Stride with an intent to mislead the public and RSA Plaintiffs.

240.    Stride's leadership knew that its public statements and related documents contained false enrollment information and information about management of enrollment caps.

241.    Furthermore, Stride's leadership were aware that the company statements and documents were disseminated to the investing public.

242. Moreover, Stride's leadership participated—materially and with knowledge or recklessness—in the dissemination of such statements or documents, which violate federal and state securities laws.

243. At least some of Stride's leaders—especially any involved in enrollment inflation, enrollment cap management, or delayed reporting—knew that a comparison of Stride's practices to its public statements provided evidence of material misrepresentation capable of inducing investors to purchase Stride's securities.

244. Because Stride's leadership had access to the company's true enrollment numbers, enrollment reporting practices, and method of "handling" government-imposed enrollment caps, Stride's leadership perpetrated a fraud on the public by making the materially misrepresentative statements cited above.

245. Therefore, Defendant either knew of the material misrepresentation or made such statements with reckless disregard for their impact on inducing securities transactions.

246. When RSA Plaintiffs sought compensation from Stride in exchange for their services, Stride offered RSA Plaintiffs Stride RSAs.

247. The exchange of services for securities counts as a purchase of securities.

248. The RSAs, though not stocks or options, are defined as securities under the Securities Exchange Act of 1934.

249. During the period leading up to RSA Plaintiffs' Independent Consultant Agreement start dates through the termination of these contracts, Stride securities were traded on an efficient market.

250.   RSA Plaintiffs relied on the market's integrity and Stride's statements in their decisions to enter service contracts for Stride that compensated them with RSAs of artificially inflated value.

251.   The announcement of the Gallup-McKinley County Schools Board of Education's allegations, coupled with the company's acknowledgement of poor enrollment performance in Fiscal Year 2026 Quarter 1, caused a precipitous drop in stock price.

252.   Were it not for Stride's misrepresentations over the prior year or more, there would not have been a precipitous drop in stock value that harmed investors.

253.   In bad faith, Stride terminated RSA Plaintiffs' contracts with the intent to prevent their shares from vesting.

254.   If the Independent Consultant Agreements' terminations were invalid, RSA Plaintiffs still retain the value of RSAs and have suffered economic loss from Stride's fraud on the market.

255.   If such terminations were valid, RSA Plaintiffs still would never have entered into the transactions and—due to the fraud on the market—are entitled to the value of the labor which Stride unjustly obtained.

256.   The inflation of the stock price harmed RSA Plaintiffs, because they bore the loss of the drastic drop of the stock price in the value of the RSAs or through their labor.

257.   Because Stride has perpetrated all necessary elements of federal securities fraud under Rule 10b-5, each RSA Plaintiff seeks to recover from Stride benefit-of-the-bargain damages for the value of the RSA each RSA Plaintiff would have received had they been able to keep their RSA and finish the contract.

## COUNT VII – VIRGINIA SECURITIES FRAUD
### (RSA Plaintiffs)

258.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

259.    RSA Plaintiffs bring this Count under the Virginia Securities Act, particularly Virginia Code §§ 13.1-502 and 13.1-522(A).

260.    RSA Plaintiffs provided their services as valuable consideration for a security from Stride—specifically, RSA compensation.

261.    As explained in detail above, the value of the RSAs had been inflated by Stride's rosy public statements, which contradicted its deceptive practices.

262.    The public, which traded Stride securities on an active and efficient market, had been influenced by Stride's deceptive statements that artificially inflated the value of Stride securities.

263.    In exchanging RSAs for services, RSA Plaintiffs accepted compensation with value that had been artificially inflated by the fraud Stride had perpetrated on the market.

264.    Therefore, Stride made a sale of securities in exchange for RSA Plaintiffs' services by employing a scheme to defraud and engaging in a practice which operated a fraud upon RSA Plaintiffs.

265.    Stride was aware that it was inflating its enrollment numbers with "ghost students," delaying its reports to school districts about such ghost students, and ignoring enrollment caps imposed by government.

266.    Stride's leadership was simultaneously cognizant that it was making public statements and presentations about its enrollment success and supposedly appropriate approach to enrollment caps.

267. At least some of the agents of Stride—especially any involved in enrollment inflation or other deceptive practices—knew that a comparison of Stride's practices to its public statements provided evidence of material misrepresentation capable of inducing investors to purchase Stride's securities.

268. Therefore, Defendant either knew or with reasonable care could have known of the material misrepresentation.

269. Because Stride has perpetrated all necessary elements of Virginia securities fraud, RSA Plaintiffs seek to recover from it the consideration paid for each of their RSAs, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees. *See* Va. Code § 13.1-522(A).

270. Moreover, because the Grant Notices were not executed and the terms of the ICA SOW 1s make effective the RSAs from August 19, 2024 onward, RSA Plaintiffs seek the full dollar amount associated with each of their RSAs as the "consideration paid for each of their RSAs" as described in the prior paragraph. *See id.*

## COUNT VIII – RULE 14A-9 VIOLATION BY MISLEADING PROXY STATEMENTS
### (All Plaintiffs)

271. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

272. Plaintiffs bring this Count under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

273. The Plaintiffs' 14(a) claim is brought on an allegation of negligence on the part of Stride and its leadership.

274. Stride's leadership negligently disseminated and approved dissemination of materially misleading written statements to Stride's shareholders through the 2024 and 2025 Proxies.

275. The 2024 and 2025 Proxies sought shareholder votes to re-elect Stride's leadership.

276. Simultaneously, the 2024 and 2025 Proxies materially misstated or omitted Stride's risk oversight and inadequate internal controls.

277. Such inadequate oversight facilitated the illegal behavior and violations described herein.

278. Due to the conduct alleged herein, Stride and its leadership violated Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder.

279. By way of example, the 2024 and 2025 Proxies represented to shareholders that the Audit Committee actively oversaw Stride's compliance with student-privacy obligations and Stride's cybersecurity protections and preparedness, including through regular reports from Stride's Chief Information Security Officer. Those representations were materially misleading because, as Plaintiffs and others within Stride contemporaneously observed, Stride retained and transmitted student-level data in an insecure manner, Stride's senior personnel openly acknowledged that core operational and information-technology systems were not functioning as represented, and these systemic deficiencies were widely known within Stride yet were neither disclosed in the Proxies nor remediated by the Board or its committees in the manner the Proxies described.

280. Due to Stride's wrongful conduct, Stride's shareholders were misled and deceived by false statements material to their decision to re-elect Stride's leadership.

281.    Plaintiffs thus seek relief for the economic loss suffered based upon the misleading 2024 and 2025 Proxies which culminated in the improper re-election of Stride's leadership.

282.    Because Stride has perpetrated all necessary elements of issuing misleading proxy statements under Rule 14a-9, each RSA Plaintiff seeks to recover from Stride benefit-of-the-bargain damages for the value of the RSA each RSA Plaintiff would have received had they been able to keep their RSA and finish the contract.

## COUNT IX – FRAUDULENT INDUCEMENT
### (All Plaintiffs)

283.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

284.    Plaintiffs bring this Count for fraudulent inducement under Virginia law.

285.    In the months leading up to and during the negotiation of SOW 2 and the RSA Plaintiffs' ICAs and ICA SOW 1s—each of which was executed on August 19, 2024—Stride and its senior leadership made and caused to be made the following material misrepresentations and omissions of present existing fact, each intended to induce Plaintiffs to enter into multi-year engagements compensated in part with restricted stock awards.

286.    First, Stride represented to the investing public, including through the August 6, 2024 earnings call, that its operational and product execution was strong and that Stride had "fixed [its] execution problems," while concealing that Stride had been forced to fully roll back the failed PowerSchool LMS migration in the summer of 2024—a known, material impairment of a core component of Stride's product offering.

287.    Second, Stride represented to the investing public that its enrollment performance was the highest in the company's history and that its growth trajectory was sustainable, while concealing that those reported figures had been inflated by the inclusion of "ghost students," the

systematic delay of student-departure reporting, and Stride's disregard of government-imposed enrollment caps.

288.    Third, Stride and its officers represented to Plaintiffs that the Plaintiffs' engagements would be long-term in duration—as memorialized in the 36-month terms of SOW 2 and each ICA SOW 1—at a time when Stride's leadership knew or recklessly disregarded that the recurring LMS migration failures and the unsustainable inflation of enrollment figures rendered Stride's stated growth trajectory, and the value of the restricted stock awards offered to RSA Plaintiffs as compensation, materially overstated.

289.    Each of the foregoing representations and omissions was material. A reasonable person in Plaintiffs' position would have considered Stride's true product condition, the integrity of its reported enrollment data, and the stability of its long-term growth trajectory significant in deciding whether to enter into multi-year service agreements compensated in part with Stride's restricted stock awards.

290.    Stride made each of the foregoing representations knowingly or with reckless indifference to its truth. Stride's senior leadership, including those involved in the August 6, 2024 earnings call, was contemporaneously aware of the failed PowerSchool migration, the practice of inflating enrollment with "ghost students," the delay of departure reporting, and the disregard of enrollment caps. Stride's subsequent conduct—including Janice Gruneberg's unsolicited March or April 2025 instruction to Mr. Scott and Mr. Morton, "don't sell your shares," made approximately six months before Stride's October 28, 2025 disclosure of the enrollment and execution shortfalls—further evidences Stride's contemporaneous knowledge that material adverse information was being withheld from the market.

291.    Stride made the foregoing representations with the specific intent of inducing Plaintiffs to enter into SOW 2, the ICAs, and the ICA SOW 1s on the terms offered—including the acceptance by RSA Plaintiffs of restricted stock awards as a substantial portion of their consideration—and with the intent of inducing Silicon Dales to scale and dedicate its workforce to the Stride engagement on a multi-year basis.

292.    Plaintiffs justifiably relied on Stride's representations. The representations were made by Stride's most senior officers, were repeated in publicly filed Securities and Exchange Commission disclosures, and were corroborated by the trading price of Stride's publicly traded securities. Plaintiffs had no independent means by which to verify Stride's internal product condition or the integrity of its enrollment reporting at the time the agreements were executed.

293.    Had Plaintiffs known the truth—including the fact of the failed PowerSchool migration, the practice of enrollment inflation, and the impaired sustainability of Stride's reported growth—Plaintiffs would not have entered into SOW 2, the ICAs, or the ICA SOW 1s on the terms offered, would not have accepted compensation in the form of restricted stock awards, and would not have scaled their workforce or business operations in reliance upon those representations.

294.    As a direct and proximate result of Stride's fraudulent inducement, Plaintiffs have suffered damages including, but not limited to: (a) the difference between the represented and actual value of the restricted stock awards; (b) the value of services rendered by Plaintiffs in reliance on the misrepresentations; (c) reliance damages incurred in scaling Plaintiffs' workforce and business operations; (d) the loss of business opportunities foregone in reliance on Stride's representations of long-term continuity; and (e) such further damages as may be proven at trial. By reason of Stride's intentional misconduct, Plaintiffs are also entitled to punitive damages and, as an alternative remedy, to rescission of the agreements.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment finding in their favor, and against Defendant as follows:

1. Finding that Defendant has materially breached the contracts with Plaintiffs Silicon Dales and RSA Plaintiffs;

2. Finding that Silicon Dales is entitled to an award of breach of contract damages of:

    a. the full remaining value of the 36-month SOW 2 contract through August 2027, in an amount to be proven at trial;

    b. reliance damages for costs incurred in scaling its workforce and business operations based on written and verbal representations regarding the long-term duration of the engagement; and

    c. restitution for the strategic value retained by Stride without proper payment.

3. Finding that the RSA Plaintiffs are entitled to an award of breach of contract damages of:

    a. The full value of RSAs, or if the Court finds that part of such RSAs had not vested:

        i. the value that would have vested had Stride not wrongfully terminated the agreements; and

        ii. the value of the services each RSA Plaintiff contributed to Stride from August 19, 2024 through the date of termination, for which they received no compensation due to Stride's bad faith termination; and

    b. consequential damages arising from Stride's breaches.

55

4. Finding that Defendant has tortiously interfered with the business relationships of Plaintiffs Silicon Dales and RSA Plaintiffs;

5. Finding that the Plaintiffs are entitled to an award of damages for:

   a. the loss of business relationships and expectancies with Tallo and other Stride portfolio companies;

   b. the harm to Silicon Dales' professional reputation;

   c. the lost profits from future engagements that Silicon Dales reasonably expected to obtain; and

   d. consequential damages.

6. Finding that Defendant's acts as described herein constituted federal and Virginia securities fraud;

7. Finding that Defendant violated Rule 14a-9;

8. Finding that Plaintiffs are entitled to an award of benefit-of-the-bargain damages for all losses and damages suffered because of the acts and transactions complained of herein pertaining to federal securities fraud, as well as the misleading proxy statements, together with pre-judgment interest;

9. Finding that Plaintiffs are entitled to an award of the consideration paid for each RSA Plaintiff's RSA, together with interest thereon at the annual rate of six percent (6%), costs, and reasonable attorneys' fees;

10. That the Court award costs, expenses, and disbursements of this action, including reasonable attorney fees; and

11. That, in connection with Count IV (Breach of Implied Covenant of Good Faith and Fair Dealing) and Count IX (Fraudulent Inducement), the Court award compensatory,

reliance, restitutionary, and consequential damages, together with punitive damages and, as an alternative remedy in connection with Count IX, rescission of the agreements; and

12. For such other or further relief as the Court may deem just and proper.

DATED this 5th day of June 2026.                    Respectfully submitted,

**SILICON DALES, LTD,**
**ROBIN SCOTT,**
**THOMAS MORTON,**
**MARCEL SCHMITZ, and**
**NUNO FILIPE MAGALHÃES AREIAS**

By:      /s/ *Clinton H. Brannon*
          Clinton H. Brannon
          Virginia State Bar No. 72340
          R. Andrew Austria
          Virginia State Bar No. 83613
          WILLIAMS MULLEN
          8350 Broad Street, Suite 1600
          Tysons, VA 22102
          Telephone: (703) 760-5200
          Facsimile: (703) 748-0244
          cbrannon@williamsmullen.com
          raustria@williamsmullen.com

          *Attorneys for Plaintiffs*

57